IN THE SUPREME COURT OF NORTH CAROLINA

 2021-NCSC-163

 No. 16PA20

 Filed 17 December 2021

STATE OF NORTH CAROLINA, ex rel. JOSHUA H. STEIN, Attorney General

 v.
KINSTON CHARTER ACADEMY, a North Carolina non-profit corporation; OZIE
L. HALL, JR., individually and as Chief Executive Officer of Kinston Charter
Academy; and DEMYRA MCDONALD HALL, individually and as Board Chair of
Kinston Charter Academy

 On discretionary review pursuant to N.C.G.S. § 7A-31(a) from a unanimous

decision of the Court of Appeals, 268 N.C. App. 531 (2019), reversing, in part, and

affirming, in part, orders entered by Judge A. Graham Shirley in the Superior Court,

Wake County, on 23 March 2018 denying dismissal motions filed by defendants

Kinston Charter Academy and Ozie L. Hall, Jr. Heard in the Supreme Court on 31

August 2021.

 Attorney General Joshua H. Stein, by Assistant Attorney General Matthew L.
 Liles, Sr.; Senior Deputy Attorney General Kevin D. Anderson; and Special
 Deputy Attorney General Daniel P. Mosteller, for the State-appellant.

 Ragsdale Liggett PLLC by Amie C. Sivon, Mary M. Webb, and Edward E.
 Coleman, III, and Demyra McDonald-Hall for defendant-appellant Kinston
 Charter Academy.

 Ozie L. Hall, Jr., pro se defendant-appellant.

 Stam Law Firm, PLLC, by R. Daniel Gibson and Paul Stam for amicus
 Pinnacle Classical Academy.
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 Womble, Bond Dickinson (US) LLP by Matthew F. Tilley for amicus N.C.
 Coalition for Charter Schools, amicus curiae.

 ERVIN, Justice.

¶1 The issues before us in this case involve the extent to which the non-profit

 corporations that operate charter schools are (1) agencies of the State entitled to

 sovereign immunity and (2) subject to claims brought pursuant to the North Carolina

 False Claims Act; whether (3) the State adequately pled claims under the False

 Claims Act against the non-profit corporation and a corporate officer; and (4) whether

 a corporate officer of such a non-profit corporation is entitled to public official

 immunity. After a careful review of the relevant legal authorities in light of the facts

 disclosed by the record, we conclude that North Carolina charter schools are not state

 agencies and are, for that reason, precluded from asserting a defense of sovereign

 immunity; that North Carolina charter schools are “persons” as defined in N.C.G.S.

 § 1-607 (2019); that the State properly pled claims against the Academy and Mr. Hall

 for purposes of the False Claims Act; and that the trial court did not err by denying

 Mr. Hall’s request that the State’s complaint be dismissed on the basis of public

 official immunity. As a result, the decision of the Court of Appeals in this case is

 affirmed, in part, and reversed, in part, with this case being remanded to the Court

 of Appeals for further remand to the Superior Court, Wake County, for further

 proceedings not inconsistent with this opinion.
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 I. Factual and Procedural History

 A. Substantive Factual Background

¶2 The Academy is a nonprofit corporation organized and existing under North

 Carolina law that began operating a charter school in 2004.1 The Academy served

 students from kindergarten through eighth grade and provided transportation for

 students residing in Lenoir, Pitt, and Greene counties. Mr. Hall served as Kinston

 Charter Academy’s Chief Executive Officer. As Chief Executive Officer, Mr. Hall

 provided both financial and academic leadership for the Academy. Mr. Hall’s wife,

 Demyra McDonald-Hall, began serving as the Chair of the Academy’s Board of

 Directors in 2007.

¶3 The Academy experienced financial difficulties from the date upon which it

 began operation and would, in all probability, have closed in 2007 except for the fact

 that five of the eight members of the Board of Directors took out personal loans for

 the purpose of ensuring the Academy’s continued operation. The Department of

 Public Instruction, which has the responsibility for overseeing North Carolina public

 1 In light of the fact that this case is before us on appeal from an interlocutory order

 addressing motions to dismiss for failure to state a claim for which relief can be granted
 pursuant to N.C.G.S. § 1A-1, Rule 12(b), we have presented the facts as stated in plaintiff’s
 complaint, including the information contained in the exhibits attached to that complaint.
 See Est. of Long v. Fowler, 378 N.C. 138, 2021-NCSC-81, ¶ 5 (stating that this Court
 “accept[ed] the allegations in the complaint as true” given that the case was before this Court
 “on the trial court’s order granting a motion to dismiss pursuant to [N.C.G.S. § 1A-1,] Rules
 12(b)(1), 12(b)(2), and 12(b)(6) of the North Carolina Rules of Civil Procedure”) (citing Corwin
 v. British Am. Tobacco PLC, 371 N.C. 605, 611 (2018).
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 schools, cited the Academy on at least six occasions between 2008 and 2013 for having

 deficit fund balances. For example, the Department placed the Academy on

 “Financial Probationary Status” on 5 June 2008 given the existence of a deficit fund

 balance that totaled over $300,000. Similarly, the Department placed the Academy

 on the highest level of “Financial Disciplinary Status” on 24 March 2010. In the final

 full year during which the Academy operated, Mr. Hall’s daughter, who did not have

 a degree in education and who had never previously worked at a school, was hired as

 the Academy’s “academic officer” at an annual salary of $40,000 in place of an

 associate principal who had more than twenty years’ experience working in public

 education. On 5 June 2013, the Department placed the Academy on “Governance

 Cautionary Status” in light of the fact that the Academy, after withholding funds

 from its employees’ paychecks, had failed to submit the amounts associated with

 premiums for those employees’ health insurance plans to the State Treasurer.

¶4 In an effort to obtain sufficient funds to pay its outstanding obligations, the

 Academy obtained two short-term loans in the spring and early summer of 2013. On

 31 May 2013, the Academy obtained a $100,000 short-term loan that included a

 $15,000 origination fee that was to be subtracted from the loan amount and a $15,000

 broker’s fee. On 21 June 2013, the Academy obtained a second $100,000 short-term

 loan that also included a $15,000 origination fee to be deducted from the loan amount

 and a separate $15,000 broker’s fee. Having guaranteed repayment of both loans,
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 Mr. Hall was personally liable to the lenders in connection with each of these

 obligations.

¶5 On 21 January 2013, the Academy reported to the Department that it projected

 having an average daily membership of 310 students, with this figure representing

 an estimate of the number of students that the Academy would enroll during the

 following academic year that was used for the purpose of establishing the amount of

 funding that the Academy was entitled to receive from the State. On 26 April 2013,

 the Academy provided the Department with a revised average projected daily

 membership of 366 students. More specifically, Mr. Hall told a representative of the

 Department during a 26 April 2013 phone call that, even though he had “not

 physically been on the [Academy] campus much and that the person [that he had] left

 in charge was incompetent,” the Academy’s projected enrollment for the 2013–14

 school year would increase to 366 students, with this revised estimate representing

 an increase of 92 students over the actual enrollment for the previous year (despite

 three years of declining enrollment) and being the maximum estimate of student

 attendance that the Academy was entitled to claim without seeking and obtaining

 prior approval from the State Board of Education. According to a later examination

 by the State Auditor, there was “no evidence supporting an estimated student

 attendance increase.”
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

¶6 In July of 2013, the Academy received funds from the local school board, with

 these funds having been used to pay off loans that had been taken out in connection

 with the previous academic year and to pay off contributions to the State Health Plan

 that the Academy had failed to make during that same period of time. On 29 July

 2013, Mr. Hall sent a letter to the Department stating that the Academy’s employees

 had been informed that the payments associated with their health insurance

 premiums and retirement contributions had been delayed, that the Academy was

 attempting to refinance the indebtedness associated with its facilities in order to

 obtain the funds needed to continue to operate the Academy, and that, in the event

 that he was unable to complete the refinancing process, he would recommend that

 the Board of Directors close the Academy.

¶7 On 6 August 2013, the Academy received over $600,000 from the State for use

 during the 2013-14 school year. This amount had been calculated based upon an

 average daily membership of 366 students and was intended to last until October

 2013, when the Academy would receive its next scheduled allotment. On the same

 day, the Academy paid Mr. Hall $5,000 for “unused vacation time.” On 12 August

 2013, the Academy paid $2,500 to Mr. Hall’s daughter for a “website redesign” that

 was never implemented. On 16 August 2013, the Academy paid Ms. McDonald-Hall

 over $1,000 as an advance against her “unused annual leave.” On the same day, the

 Department sent a letter to Mr. Hall for the purpose of informing the Academy that
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 the Department intended to recommend the revocation of the Academy’s charter in

 light of its persistent failure to comply with applicable financial requirements and its

 failure to pay employee benefits. On 22 August 2013, the Academy made another

 payment of $1,500 to Mr. Hall for “unused annual leave.” On 23 August 2013, Mr.

 Hall sent an e-mail to a Department official stating that he had recommended to the

 Board that the Academy “close the school and surrender the charter to the State

 Board of Education.”

¶8 At the time that the Academy opened on 26 August 2013, it had enrolled only

 189 students for the 2013–14 academic year, an amount that was 177 students less

 than the estimate that the Academy had submitted to the Department in the spring.

 In spite of Mr. Hall’s 23 August 2013 e-mail, the Board discussed, over the course of

 the ensuing week, the implementation of a “corrective action plan” that involved a

 change in the Academy’s management structure and was intended to keep the

 Academy open. On 4 September 2013, after the Department rejected requests made

 by Mr. Hall and Ms. McDonald-Hall for additional time within which the Academy

 would be allowed to implement a corrective action plan, the Academy relinquished its

 charter to the State. Two days later, on the ninth day of the academic year, the

 Academy closed.

¶9 On 10 September 2013, Department officials informed Mr. Hall and Ms.

 McDonald-Hall during a contentious meeting that the Academy would need to repay
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 the funds that had been allotted to the Academy based upon the over-estimate of its

 student enrollment numbers. Mr. Hall refused to grant the Department officials

 access to the Academy’s records and later complained that the Department was

 attempting to conduct an “illegal search and seizure” of those records. On 12

 September 2013, the Board held a meeting during which it approved the payments

 that had been made to Mr. Hall and Ms. McDonald-Hall relating to “unused annual

 leave” and the purchase of a new laptop computer to replace Mr. Hall’s personal

 computer.

¶ 10 On 28 January 2015, the Office of the State Auditor released the findings that

 it had made as the result of an investigation into the Academy’s failure. The Auditor

 found that the Academy had “overstated enrollment,” that it had “employed

 defendants Hall and McDonald-Hall’s unqualified relatives at a cost to the school [of]

 $92,500 in the final year,” and that “defendants Hall and McDonald-Hall accepted

 over $11,000 in questionable payments despite owing more than $370,000 in payroll

 obligations” to the Academy’s employees. The State did not recoup any funds from

 the Academy after it closed.

 B. Procedural History

¶ 11 On 26 April 2016, the State filed a complaint against the Academy; Mr. Hall,

 both individually and as the Academy’s Chief Executive Officer; and Ms. McDonald-

 Hall, both individually and as the Chair of the Academy’s Board. In its complaint,
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

the State alleged that the defendants had “violated the North Carolina False Claims

Act by making false or fraudulent statements” in order to receive money from the

State, with these statements having included the Academy’s projected enrollment of

366 students, “a number that defendants knew or should have known they would not

achieve”; the Academy’s “claim for state educational funds for the 2013–14 school

year when defendants knew or should have known that [the Academy] would not

survive the year”; and the Academy’s “false claim for state funds to be used for a non-

profit educational purpose that were instead used to benefit defendants.” Secondly,

the State alleged that defendants had violated various duties imposed upon them by

the statutory provisions governing the operation of non-profit corporations by

“[m]aking unreasonable distributions to directors and officers”; by “[f]ailing to

discharge their duties to the corporation in good faith[,] with ordinary care[,] and [in]

a manner in the best interest of the corporation”; by “[f]ailing to comply with the

conflict of interest requirements”; and by “[f]ailing to comply with [the statute] in

disposing of all or substantially all of [the Academy]’s assets.” The State also alleged

that Mr. Hall and Ms. McDonald-Hall had violated other relevant statutory

provisions by failing to discharge their duties “in good faith,” “with the care an

ordinarily prudent person in a like position would exercise under similar

circumstances,” and “in a manner [that they] reasonably believe[d] to be in the best

interests of the corporation.” Finally, the State alleged that defendants had violated
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 the North Carolina Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75-1.1

 (2019), by “convincing prospective students to enroll for the 2013-14 school year

 despite knowing that it was unlikely [that the Academy] would make it through the

 year” and by misleading and deceiving consumers.

¶ 12 On 26 May 2017, Mr. Hall filed a motion to dismiss the claims that the State

 had lodged against him in his individual capacity pursuant to N.C.G.S. § 1A-1, Rules

 12(b)(1) and 12(b)(6). On 30 June 2017, Ms. McDonald-Hall made a filing in which

 she requested that all of the claims that had been lodged against her and against the

 Academy be dismissed. On 17 August 2017, the trial court entered an order denying

 Mr. Hall’s motion for dismissal of the False Claims Act claim that had been brought

 against him in his individual capacity while granting his motion to dismiss the claims

 that the State had lodged against him pursuant to the statutes governing the

 operation of non-profit corporations and N.C.G.S. § 75-1.1 and allowing Ms.

 McDonald-Hall’s motion to dismiss all of the claims that the State had asserted

 against her in her individual capacity.

¶ 13 On 13 February 2018, Mr. Hall filed another motion in which he sought to have

 the State’s False Claims Act claim dismissed pursuant to N.C.G.S. § 1A-1, Rule

 12(b)(1). On 9 March 2018, the “[c]orporate [d]efendants,” a group that consisted of

 the Academy and Ms. McDonald-Hall and Mr. Hall, acting in their official capacities,

 filed a motion to dismiss the State’s remaining claims pursuant to N.C.G.S. § 1A-1,
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 Rules 12(b)(1), 12(b)(3), and 12(b)(6). On 23 March 2018, the trial court entered an

 order denying Mr. Hall’s motion to dismiss the False Claims Act claim that had been

 lodged against him in his individual capacity and a separate order denying the motion

 to dismiss the False Claims Act claim that had been lodged against the Academy

 while granting the motion to dismiss the claims that the State had asserted against

 the Academy pursuant to the statutory provisions governing the operation of non-

 profit corporations and N.C.G.S. § 75-1.1 and all of the claims that the State had

 asserted against Mr. Hall and Ms. McDonald-Hall in their official capacities. Mr.

 Hall and the Academy noted appeals to the Court of Appeals from the trial court’s

 orders.

¶ 14 In seeking relief from the trial court’s order before the Court of Appeals, the

 Academy argued that the trial court had erred by denying its motion to dismiss the

 False Claims Act claim that had been asserted against it given that the Academy was

 protected from liability under the False Claims Act by the doctrine of sovereign

 immunity. In addition, the Academy argued that the State had failed to plead its

 False Claims Act claim with the requisite “particularity” and that the “[a]lleged

 [f]alse [s]tatement,” which involved the estimate of the number of students that the

 Academy would enroll for the 2013–14 academic year, was “an [a]uthorized

 [p]rojection for the [f]uture, [n]ot [p]ossible of [b]eing [f]alse at the [t]ime [i]t [w]as

 [m]ade.” Similarly, Mr. Hall sought relief from the trial court’s order before the Court
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 of Appeals on the grounds that an “enrollment goal of 366 students” was permitted

 by law and could not, for that reason, be a “false or fraudulent claim.” In addition,

 Mr. Hall argued that the State’s False Claims Act claim was barred by the separation

 of powers clause of the North Carolina Constitution and “the doctrine of

 governmental/public official immunity.”

¶ 15 In a unanimous published opinion, the Court of Appeals reversed the trial

 court’s order denying the Academy’s motion to dismiss the State’s False Claims Act

 claim on the grounds that the Academy was entitled to sovereign immunity and that

 it did not qualify as a “person” for purposes of the False Claims Act. State v. Kinston

 Charter Acad., 268 N.C. App. 531, 536 (2019). In reaching this result, the Court of

 Appeals began by reasoning that, since N.C.G.S. § 115C-238.29E(a) (2013), which was

 subsequently recodified as N.C.G.S § 115C-218.15 (2019), provided that a “charter

 school that is approved by the State shall be a public school within the local school

 administrative unit in which it is located,” all charter schools were public schools.

 Kinston, 268 N.C. App. at 537. In addition, the Court of Appeals held that “[c]harter

 schools, as public schools in the State of North Carolina, exercise the power of the

 State and are an extension of the State itself” and, “as an extension of the sovereign,”

 “are entitled to exercise the State’s sovereign immunity” and that the Academy’s

 “presumption of immunity” from liability pursuant to the False Claims Act could

 “only be overcome by an affirmative showing that the General Assembly intended to
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 waive sovereign immunity for all public schools,” a showing that the State had failed

 to make. Id. at 538–39.

¶ 16 The Court of Appeals went on to hold that, “assuming, arguendo, that charter

 schools [we]re not categorically entitled to claim sovereign immunity from the” False

 Claims Act, the Academy could not be the subject of a claim brought pursuant to the

 False Claims Act given that the Academy functioned as an “arm of the state” for

 purpose of federal Eleventh Amendment analysis and was not, for that reason, a

 “person” for purposes of the False Claims Act. Id. at 539–40. After acknowledging

 that the False Claims Act should be interpreted “so as to be consistent with the

 federal False Claims Act,” citing N.C.G.S. § 1-616(c), the Court of Appeals stated that

 “federal courts employ the Eleventh Amendment arm-of-the-state analysis in

 determining whether an entity is a ‘person’ under the” federal False Claims Act, with

 the required analysis focusing upon:

 (1) whether any judgment against the entity as
 defendant will be paid by the State or whether any recovery
 by the entity as plaintiff will inure to the benefit of the
 State;

 (2) the degree of autonomy exercised by the entity,
 including such circumstances as who appoints the entity's
 directors or officers, who funds the entity, and whether the
 State retains a veto over the entity's actions;

 (3) whether the entity is involved with state concerns as
 distinct from non-state concerns, including local concerns;
 and
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 (4) how the entity is treated under state law, such as
 whether the entity’s relationship with the State is
 sufficiently close to make the entity an arm of the State.

 Kinston, 268 N.C. App. at 540 (citing United States ex rel. Oberg v. Ky. Higher Educ.

 Student Loan Corp., 681 F.3d 575, 580 (4th Cir. 2012)).

¶ 17 In addressing the first of these factors, the Court of Appeals noted that a

 charter school’s board of directors is required to obtain liability insurance under

 N.C.G.S. § 115C-218.20. Id. at 541. The Court of Appeals went on to explain that,

 prior to 1997, N.C.G.S. § 115C-238.29F(c), which has been recodified as N.C.G.S.

 § 115C-218.20 (2019), did not mention the immunity of charter schools, but that

 language added by the 1997 amendment provides that “[a]ny sovereign immunity of

 the charter school . . . is waived to the extent of indemnification by insurance,” with

 this amendment constituting an acknowledgment that charter schools did “enjoy the

 State’s sovereign immunity” while “waiv[ing] charter school immunity to the extent

 of indemnification by insurance.” Kinston, 268 N.C. App. at 542. As a result, the

 Court of Appeals held that civil liability under the False Claims Act did not “attach[ ]

 to charter schools themselves, beyond the extent of indemnification by insurance,

 absent waiver.” Id.

¶ 18 As far as the second factor in the required analysis is concerned, the Court of

 Appeals recognized that a charter school has a high degree of autonomy from the

 State in matters relating to the manner in which the school is operated and issues
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 relating to budgets, management, and curriculum. On the other hand, however, the

 Court of Appeals acknowledged that the charter school’s authority is “limited by

 regulatory and reporting requirements” imposed by the State, so that its “autonomy

 only extends as far as [it complies] with its Board-approved charter and oversight by

 [the Department of Public Instruction].” Id. at 543.

¶ 19 In addressing the third factor, the Court of Appeals determined that the North

 Carolina Constitution “makes the State solely responsible for ensuring ‘the right of

 every child in North Carolina to receive a sound basic education.’ ” Id. at 544 (quoting

 Silver v. Halifax Cnty. Bd. of Comm’rs, 371 N.C. 855, 856 (2018)). After reiterating

 its earlier determination that charter schools were public schools pursuant to

 N.C.G.S. § 115C-238.29E(a) (2013), subsequently recodified as N.C.G.S § 115C-

 218.15 (2019), and that public schools “directly exercise the power of the State,”

 Kinston, 268 N.C. App. at 544 (quoting Bridges v. City of Charlotte, 221 N.C. 472, 478

 (1942)), and after “considering and balancing all of the applicable factors of the arm-

 of-the-state inquiry,” the Court of Appeals concluded that “charter schools [we]re not

 ‘persons’ for purposes of the” False Claims Act and that the trial court had erred by

 denying the Academy’s motion to dismiss the False Claims Act claim that the State

 had asserted against it. Id.

¶ 20 Next, the Court of Appeals rejected Mr. Hall’s contention that the trial court

 had erred by refusing to dismiss the False Claims Act claim that had been lodged
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 against him in his individual capacity on the grounds that he was entitled to public

 official immunity. Id. at 545. After noting that a public official “may be entitled to

 assert immunity even as to claims against [him] in his individual capacity,” the Court

 of Appeals acknowledged that such immunity was “not limitless” and that a public

 official could be held liable for actions that were “corrupt, malicious, or outside the

 scope of his duties.” Id. (citing Smith v. Hefner, 235 N.C. 1, 7 (1952)). As a result,

 the Court of Appeals held that, “at this early stage of the proceedings, viewing the

 material allegations of the State’s complaint as admitted for purposes of [Mr.] Hall’s

 motion to dismiss, [Mr.] Hall has not yet raised sufficient evidence of his entitlement

 to public official immunity to defeat the State’s claim” and affirmed the trial court’s

 denial of Mr. Hall’s motion to dismiss the False Claims Act claim that the State had

 asserted against him. Id. at 546. This Court granted petitions for discretionary

 review filed by the State and conditional petitions for discretionary review filed by

 the Academy and Mr. Hall, all of which sought review of different aspects of the Court

 of Appeals’ decision.

 II. Analysis

 A. Standard of Review

¶ 21 “North Carolina has a well-established common law doctrine of sovereign

 immunity which prevents a claim for relief against the State except where the State

 has consented or waived its immunity.” Harwood v. Johnson, 326 N.C. 231, 238
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 (1990) (quoting Electric Co. v. Turner, 275 N.C. 493 (1969)). Sovereign immunity

 applies to “state agenc[ies] created for the performance of essentially governmental

 functions” which are generally shielded from civil liability in the absence of a

 statutorily-based waiver. Id.

¶ 22 The doctrine of governmental immunity, which resembles that of sovereign

 immunity, renders local governments such as counties and municipal corporations

 “immune from suit for the negligence of [their] employees in the exercise of

 governmental functions absent waiver of immunity.” Meyer v. Walls, 347 N.C. 97,

 104 (1997) (quoting State ex rel. Hayes v. Billings, 240 N.C. 78, 80 (1954)). Although

 “[t]he State’s sovereign immunity applies to both its governmental and proprietary

 functions,” the “more limited governmental immunity covers only the acts of a

 municipality or a municipal corporation committed pursuant to its governmental

 functions.” Evans v. Hous. Auth. of City of Raleigh, 359 N.C. 50, 53 (2004) (quoting

 Guthrie v. N.C. State Ports Auth., 307 N.C. 522, 533 (1983)). In other words, while

 governmental immunity protects units of local government from suit for “acts

 committed in [their] governmental capacity,” if the entity in question “undertakes

 functions beyond its governmental and police powers and engages in business in order

 to render a public service for the benefit of the community for a profit, it becomes

 subject to liability for contract and in tort as in case of private corporations.” Id.

 (quoting Town of Grimesland v. City of Washington, 234 N.C. 117, 123 (1951))
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 (cleaned up). As a result, while a unit of local government may be entitled to

 governmental immunity “in tort and contract for acts undertaken by its agents and

 employees in the exercise of its governmental functions,” such entities do not enjoy

 the full protections of sovereign immunity which the State and its agencies enjoy. Id.

 A state agency may assert sovereign immunity, or a municipal corporation may assert

 governmental immunity, as a complete defense to a civil lawsuit at the pleading

 stage. See Guthrie v. N.C. State Ports Auth., 307 N.C. 522, 527 (1983).

¶ 23 As a general proposition, interlocutory orders are not immediately appealable

 unless the order in question affects a substantial right. N.C.G.S. § 7A-27(b)(3)(a)

 (2019). Although an order denying a dismissal motion predicated upon the doctrine

 of sovereign immunity is interlocutory in nature, such an order is immediately

 appealable “because it represents a substantial right.” Craig v. New Hanover Cnty.

 Bd. of Educ., 363 N.C. 334, 338 (2009). This Court reviews a trial court’s decision to

 grant or deny a motion to dismiss based upon the doctrine of sovereign immunity

 using a de novo standard of review. See White v. Trew, 366 N.C. 360, 362–63 (2013)

 (reviewing an appeal from a trial court order denying “a motion to dismiss that raises

 sovereign immunity as grounds for dismissal” utilizing a de novo standard of review).

¶ 24 Similarly, this Court reviews issues involving the construction of statutes

 using a de novo standard of review. Wilkie v. City of Boiling Spring Lakes, 370 N.C.

 540, 547 (2018) (quoting In re Ernst & Young, LLP, 363 N.C. 612, 616 (2009)). “It is
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 well settled that where the language of a statute is clear and unambiguous, there is

 no room for judicial construction and the courts must construe the statute using its

 plain meaning.” In re Est. of Lunsford, 359 N.C. 382, 391–92 (2005) (quoting Burgess

 v. Your House of Raleigh, Inc., 326 N.C. 205, 209 (1990)) (cleaned up).

¶ 25 Finally, in determining whether a trial court correctly decided whether to

 dismiss a complaint for failure to state a claim for relief pursuant to N.C.G.S. § 1A-1,

 Rule 12(b)(6), this Court examines “whether the allegations of the complaint, if

 treated as true, are sufficient to state a claim upon which relief can be granted under

 some legal theory.” Bridges v. Parrish, 366 N.C. 539, 541 (2013) (quoting Coley v.

 State, 360 N.C. 493, 494–95 (2006)). In conducting the required analysis, “the

 allegations of the complaint must be viewed as admitted, and on that basis the court

 must determine as a matter of law whether the allegations state a claim for which

 relief may be granted.” Davis v. Hulsing Enterprises, LLC, 370 N.C. 455, 457 (2018)

 (quoting Stanback v. Stanback, 297 N.C. 181, 185 (1979)). N.C.G.S. § 1A-1, “Rule

 12(b)(6), generally precludes dismissal except in those instances where the face of the

 complaint discloses some insurmountable bar to recovery.” Newberne v. Dep’t of

 Crime Control & Pub. Safety, 359 N.C. 782, 784 (2005) (quoting Energy Investors

 Fund, L.P. v. Metric Constructors, Inc., 351 N.C. 331, 337 (2000)) (cleaned up).2 We

 2 Although a number of the motions that underlie the issues that are before us in this

 case were lodged pursuant to N.C.G.S. § 1A-1, Rule 12(b)(1) in addition to N.C.G.S. § 1A-1,
 Rule 12(b)(6), the standard of review for such motions is the same as the standard for motions
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 will now evaluate the issues that have been presented for our consideration using the

 applicable standards of review.

 B. Liability of Kinston Charter Academy

 1. Sovereign Immunity

¶ 26 In seeking to persuade us to reverse the Court of Appeals’ decision in this case,

 the State begins by contending that the Court of Appeals erred by deciding that

 charter schools were entitled to the protections afforded by the doctrine of sovereign

 immunity. In the State’s view, the Charter School Act, which is contained in Chapter

 115C of the North Carolina General Statutes, demonstrates that charter schools are

 private, rather than public, institutions. In addition, the State cites our decision in

 Turner v. Gastonia City Board of Education, 250 N.C. 456, 463 (1959), for the

 proposition that local school boards in North Carolina are not considered

 “departments, institutions, [or] agencies of the State” and that local school boards

 operate with a significant degree of autonomy. Furthermore, the State argues that

 Turner distinguishes between the State Board of Education, which is an agency of

 the State, and local school boards, which serve “purely local functions.” Id. According

 to the State, since charter schools enjoy an even greater level of autonomy from State

 control than is the case with local school boards and are “purely local” in character,

 lodged pursuant to N.C.G.S. § 1A-1, Rule 12(b)(6), given that the only factual materials
 presented for the trial court’s consideration were those contained in the complaint. Estate of
 Long, 2021-NCSC-81, ¶ 15.
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 charter schools are not entitled to the protections of the doctrine of sovereign

 immunity.

¶ 27 The State also contends that any judgment entered against the Academy in

 this case would not be collectable from the State given that the State is not liable for

 any acts or omissions of a charter school, N.C.G.S. § 115C-218.20(b); that the debt

 incurred by a charter school does not “constitute an indebtedness of the State or its

 political subdivisions,” N.C.G.S. § 115C-218.105; and that the State seeks to recoup

 money that it had previously allocated to the Academy in this litigation. In the State’s

 view, the fact that a judgment against a charter school would not be collectable from

 the State treasury weighs heavily against a finding that a charter school like the

 Academy is entitled to sovereign immunity. See Smith v. State, 289 N.C. 303, 321

 (1976) (holding that the State of North Carolina was not entitled to assert sovereign

 immunity as a defense in a contract action given that the State typically “keep[s] its

 part of the bargain” after entering into a valid contract and that the Court’s holding

 would not “have a significant impact upon the State treasury or substantially affect

 official conduct”).

¶ 28 Similarly, the State contends that relevant provisions of the Charter School

 Act demonstrate that the General Assembly did not intend for charter schools to be

 categorized as state agencies, with this contention resting upon the statutory

 requirement that charter schools “operate independently of existing schools” and that
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 charter schools be “operated by [] private nonprofit corporation[s].”

 N.C.G.S. §§ 115C-218(a), 115C-218.15(b). In addition, the State points to the

 contrast between the language contained in the Charter School Act and that

 contained in the legislation creating the State Ports Authority, which this Court has

 determined to be a state agency entitled to assert the defense of sovereign immunity,

 see Guthrie, 307 N.C. at 528 (1983), with the latter having provided that the State

 Ports Authority was “created as an instrumentality of the State of North Carolina,”

 that the Authority was a “division of the Department of Commerce,” and that the

 Authority provided a means by which “the State of North Carolina may engage in

 promoting, developing, constructing, equipping, maintaining and operating the

 harbors and seaports within the State,” id. at 527–28 (citing N.C.G.S. §§ 143B–453,

 431(2)(l) (1981)), while the former contained no such language.

¶ 29 Finally, the State contends that the Academy is not entitled to rely upon a

 defense of sovereign immunity in response to an action brought by the State given

 that the immunity of a lesser sovereign, such as a county, local school board, or

 charter school, must yield to the greater sovereignty of the State. See State Highway

 Comm’n. v. Greensboro City Bd. of Educ., 265 N.C. 35, 39–40 (1965) (holding that the

 State Highway Commission, which was a “State agency or instrumentality,” was

 entitled to use the State’s power of eminent domain to take property belonging to a

 local school board); see also N.C. DOT v. Cnty. of Durham, 181 N.C. App. 346, 349
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 (2007) (reasoning that, “[b]ecause the counties derive their sovereign immunity and

 all other powers and authority from the State” “the counties’ sovereign immunity

 cannot be superior to that of the State”). As a result, for all of these reasons, the State

 urges us to reverse the Court of Appeals’ determination that the Academy was

 entitled to rely upon a defense of sovereign immunity in response to the claim that

 the State had asserted against it pursuant to the False Claims Act.

¶ 30 In seeking to persuade us to affirm the Court of Appeals’ decision with respect

 to the sovereign immunity issue, the Academy claims that it is a part of the North

 Carolina school system rather than a unit of local government. In addition, the

 Academy emphasizes the provisions of the Charter School Act which “show[ ] that

 [charter schools] are public schools” and which “discuss how a charter school may

 waive sovereign immunity”; the fact that the North Carolina Constitution “requires

 [that] the State provide education and [that] charter schools help fulfill this

 mandate”; and the fact that “charter schools function as part of the State” and are

 managed as such. The Academy argues that the existence of N.C.G.S. § 115C-218.20

 (formerly section 115C-238.29F(c)), which provides that “[a]ny sovereign immunity of

 the charter school . . . is waived to the extent of indemnification by insurance,”

 demonstrates the General Assembly’s recognition that charter schools “are an

 extension of the sovereign and have sovereign immunity except to the extent it is

 waived” by statute. The Academy further notes that appellate courts in Texas and
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 Georgia have recently found that charter schools are entitled to sovereign immunity

 under their respective state laws, see El Paso Educ. Initiative, Inc. v. Amex Properties,

 LLC, 602 S.W.3d 521, 530 (Tex. 2020); see also Campbell v. Cirrus Educ., Inc., 355

 Ga. App. 637, 641 (2020), and contends that the General Assembly has not provided

 for a waiver of sovereign immunity with respect to claims asserted under the False

 Claims Act, so that such a claim cannot be maintained against a charter school. See

 Orange Cty. v. Heath, 282 N.C. 292, 296 (1972) (holding that sovereign immunity

 cannot be “abrogated, abridged, or surrendered, except in deference to plain, positive

 legislative declarations to that effect”).

¶ 31 The Academy argues that the relevant authorities provide no support for the

 State’s claim that “lesser sovereigns” are not entitled to assert a defense of sovereign

 immunity in opposition to claims advanced by the State given that both the State and

 its agencies enjoy “absolute and unqualified” sovereign immunity, citing Guthrie, 307

 N.C. at 534–35. As additional support for this contention, the Academy directs our

 attention to N.C. Insurance Guaranty Ass’n v. Board of Trustees of Guilford Technical

 Community College, 364 N.C. 102, 112 (2010), in which this Court held that the

 General Assembly had clearly waived sovereign immunity by making the Workers’

 Compensation Act applicable to claims brought by governmental employees.

 According to the Academy, the Court in N. Carolina Ins. Guar. Ass’n “necessarily
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 found that sovereign immunity was otherwise available as a defense that could be

 waived” by the community college.

¶ 32 In assessing whether charter schools are state agencies entitled to assert a

 defense of sovereign immunity, we begin by examining the relevant provisions of the

 Charter School Act. In authorizing the creation of such schools, the General

 Assembly stated that they were intended to “provide opportunities for teachers,

 parents, pupils, and community members to establish and maintain schools that

 operate independently of existing schools.” N.C.G.S. § 115C-218(a). In addition, the

 General Assembly provided that,

 (a) A charter school that is approved by the State shall
 be a public school within the local school administrative
 unit in which it is located. All charter schools shall be
 accountable to the State Board for ensuring compliance
 with applicable laws and the provisions of their charters.

 (b) A charter school shall be operated by a private
 nonprofit corporation that shall have received federal tax-
 exempt status no later than 24 months following final
 approval of the application. The board of directors of the
 charter schools shall adopt a conflict of interest and anti-
 nepotism policy that includes, at a minimum, the following:

 (1) The requirements of Chapter 55A of the
 General Statutes related to conflicts of interest.

 ...

 (d) The board of directors of the charter school shall
 decide matters related to the operation of the school,
 including budgeting, curriculum, and operating
 procedures.
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 N.C.G.S. § 115C-218.15. The General Assembly has prohibited charter schools from

 charging tuition, N.C.G.S. § 115C-218.50, and has provided that they be primarily

 funded by the State and local school boards, which allocate funds to charter schools

 on a per-pupil basis. More specifically, for each child attending a charter school, the

 State must distribute “[a]n amount equal to the average per pupil allocation for

 average daily membership from the local school administrative unit allotments in

 which the charter school is located,” while the relevant local school board must

 distribute “an amount equal to the per pupil share of the local current expense fund

 of the local school administrative unit” to the charter school. N.C.G.S. § 115C-

 218.105. In the event that a charter school increases its enrollment by twenty percent

 or less from one academic year to the next, that increase is not considered a “material

 revision” subject to approval by the State Board of Education. N.C.G.S. § 115C-218.7.

 If the school’s enrollment increases by a figure that is greater than twenty percent,

 the charter school must obtain a charter amendment authorizing such an increase

 from the State Board of Education. Id.

¶ 33 As this Court has previously stated, the General Assembly’s decision to

 explicitly categorize an entity as an agency of the State “carries great weight.”

 Guthrie, 307 N.C. at 528. The General Assembly has not, for whatever reason, chosen

 to categorize charter schools as state agencies or instrumentalities and has, instead,

 classified charter schools as entities that “operate independently of existing schools”
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 that are run by “private non-profit corporations.” As a result, given that statutory

 language must be construed in accordance with its clear and unambiguous meaning,

 we hold that the General Assembly did not intend for charter schools to be deemed to

 be agencies or instrumentalities of the State.

¶ 34 Although the Academy and the Court of Appeals place considerable reliance

 upon the 1997 amendment to the Charter School Act addressing the extent to which

 charter schools may be held to be civilly liable in the course of concluding that charter

 schools are entitled to assert a defense of sovereign immunity, we do not find that

 argument persuasive. According to the relevant statutory language:

 (a) The board of directors of a charter school may sue
 and be sued. The State Board of Education shall adopt
 rules to establish reasonable amounts and types of liability
 insurance that the board of directors shall be required by
 the charter to obtain. The board of directors shall obtain
 at least the amount of and types of insurance required by
 these rules to be included in the charter. Any sovereign
 immunity of the charter school, of the organization that
 operates the charter school, or its members, officers, or
 directors, or of the employees of the charter school or the
 organization that operates the charter school, is waived to
 the extent of indemnification by insurance.

 (b) No civil liability shall attach to the State Board of
 Education, the Superintendent of Public Instruction, or to
 any of their members or employees, individually or
 collectively, for any acts or omissions of the charter school.

 N.C.G.S. § 115C-218.20 (2019). Although the Academy and the Court of Appeals

 contend that the statutory references to “[a]ny sovereign immunity of the charter
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 school” effectively grants sovereign immunity to such institutions, we are unable to

 read the relevant statutory language in that fashion. Instead, when read literally,

 N.C.G.S. § 115C-218.20(a) simply states that, to the extent that sovereign immunity

 is otherwise available to charter schools, any such immunity is waived to the extent

 that the school purchases liability insurance. For that reason, the extent to which

 the school is, in fact, entitled to rely upon a defense of sovereign immunity must be

 determined on the basis of an analysis of other legal authorities rather than on the

 basis of the provisions of N.C.G.S. § 155C-218.20(a). Our construction of N.C.G.S.

 § 115C-218.20(a) to this effect is bolstered by the language of N.C.G.S. § 115C-

 218.20(b), which is obviously intended to ensure that the Superintendent of Public

 Instruction, the State Board of Education, and their agents cannot be held liable for

 the acts or omissions of a charter school, with such a provision being unnecessary in

 the event that charter schools were afforded the benefits of sovereign immunity.

¶ 35 In addition, we agree with the State’s contention that charter schools are local

 rather than statewide in character and that such locally oriented entities are typically

 protected by governmental, rather than sovereign, immunity. In Turner v. Gastonia

 City Board of Education, 250 N.C. 456, this Court examined the viability of a claim

 asserted by the plaintiff stemming from an injury that allegedly resulted from the

 negligent operation of a lawnmower by an employee of the Gastonia City Board of

 Education, with the question before the Court in that case being whether the plaintiff
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

was entitled to recover compensatory damages from the local board of education, the

State Board of Education, or both, and whether any such claim had to be heard before

the Industrial Commission, which has exclusive jurisdiction over claims brought

against the State pursuant to the State Tort Claims Act. Id. At 460. In distinguishing

between a local school board and the State Board of Education, this Court held that

the State Board of Education, but not local school boards, could be held liable under

the State Tort Claims Act on the theory that

 [t]he General Assembly created the State Board of
 Education and fixed its duties. It is an agency of the State
 with statewide application. The General Assembly
 likewise created the county and city boards and fixed their
 duties which are altogether local. The Tort Claims Act,
 applicable to the State Board of Education and to the State
 departments and agencies, does not include local units
 such as county and city boards of education.

Id. at 462–63. At that point, the Court addressed the issue of whether an employee

of a local school board was an employee of the State, so that the State could be held

liable for negligent conduct on the part of such an employee under the State Tort

Claims Act. Id. at 463. In answering this question in the negative, this Court stated

that:

 [i]n no sense may we consider the Gastonia City Board of
 Education in the same category as the State Board of
 Education . . . . The Gastonia City Board of Education does
 not meet the classification. County and city boards of
 education serve very important, though purely local
 functions. The State contributes to the school fund, but the
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 local boards select and hire the teachers, other employees
 and operating personnel. The local boards run the schools.

 Id. As a result, in determining that local school boards had a “purely local” character

 and were not agencies or instrumentalities of the State, this Court held that the

 plaintiff was not entitled to maintain a claim against either defendant given that

 local school boards were protected by the doctrine of governmental immunity and an

 employee of a local school board was not an employee of the State.

¶ 36 This Court’s conclusion in Turner that local school boards were not state

 agencies or instrumentalities was echoed by the decision of the United States Court

 of Appeals for the Fourth Circuit in Cash v. Granville County Board of Education,

 242 F.3d 219, 221 (4th Cir. 2001). In Cash, the Fourth Circuit held that, since the

 Granville County Board of Education was “more like a county than an arm of the

 State,” id. at 221, it was not entitled to rely upon the doctrine of sovereign immunity,

 reasoning that, even though state agencies and state instrumentalities are protected

 by the State’s sovereign immunity for Eleventh Amendment purposes, any such

 immunity “does not extend to counties and similar municipal corporations . . . even if

 the counties and municipalities exercise a slice of State power,” id. at 222 (cleaned

 up). As a result, both this Court and the Fourth Circuit have recognized that local

 school boards are not entitled to claim sovereign, as compared to governmental,

 immunity.
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

¶ 37 As we understand the applicable statutory provisions, the board of directors of

 a charter school serves much the same function as a local school board, in that both

 entities are responsible for the immediate supervision of the schools subject to their

 control. Admittedly, while local school boards control the school system in a

 particular geographic area, charter schools are not subject to any such specific

 statutorily grounded geographic constraint. On the other hand, most charter schools

 are subject to a de facto geographic limitation in that, as a practical matter, they can

 only serve students that are able to travel to and from the school on a daily basis.3

 The State, on the other hand, has responsibility for establishing the overall policies,

 rules, and regulations applicable to both local school boards and charter school boards

 of directors. In other words, both local school boards and charter school boards of

 directors have much more hands-on responsibility for the operation of specific

 educational institutions than either the Department of Public Instruction or the State

 Board of Education. Thus, given the similarities between the functions performed by

 a local school board and the board of directors of a charter school and given that a

 local school board is entitled to governmental, rather than sovereign, immunity, we

 conclude that the analogy between these two types of school governmental entities

 suggests that charter schools are entitled to, at most, assert a defense of

 3 For example, the Academy only served students from Lenoir, Pitt, and Greene
 counties.
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 governmental, rather than sovereign, immunity.4 As a result, for all of these reasons,

 we conclude that the Court of Appeals erred by holding that charter schools are

 entitled to assert a defense of sovereign immunity in opposition to the False Claims

 Act claim that the State brought against the Academy.

 2. Whether the Academy is a “person” under the False Claims Act

¶ 38 In seeking to persuade us that the Court of Appeals erred by holding that the

 Academy was not a “person” for purposes of the False Claims Act, the State begins

 by noting that, while the False Claims Act does not contain a specific definition of a

 “person,” a generally applicable statute provides that “[t]he word ‘person’ shall extend

 and be applied to bodies politic and corporate, as well as to individuals, unless the

 context clearly shows to the contrary.” N.C.G.S. § 12-3(6) (2019). In the State’s view,

 the definition of a “person” contained in N.C.G.S. § 12-3(6) is sufficiently broad to

 encompass corporate entities such as nonprofit corporations even if those entities

 perform public functions, as long as the entity in question is not entitled to rely upon

 4 The Academy did not clearly argue before either this Court or the Court of Appeals

 that it was immune from suit in this case on the basis of the doctrine of governmental
 immunity. Instead, both the Academy and the Court of Appeals focused their attention upon
 the issue of whether the Academy was entitled to assert a defense of sovereign immunity.
 Assuming, without in any way deciding, that the Academy would be entitled to rely on a
 defense of governmental immunity and that it had properly asserted such a defense in this
 case, any such contention would lack merit given that the governmental immunity available
 to local governmental entities must necessarily yield to the greater sovereignty of the State.
 See Cnty. of Durham, 181 N.C. App. at 349 (reasoning that, “[b]ecause the counties derive
 their sovereign immunity and all other powers and authority from the State . . . the counties’
 sovereign immunity cannot be superior to that of the State”).
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 a defense of sovereign immunity. In support of this assertion, the State directs our

 attention to Jackson v. Housing Authority of High Point, 316 N.C. 259, 264 (1986), in

 which we presumed that the General Assembly was aware of the manner in which a

 “person” was defined in N.C.G.S. § 12-3 at the time that it enacted N.C.G.S. § 28A-

 18-2, which creates a statutory cause of action for wrongful death, so that

 governmental entities such as municipal corporations constituted “persons” and

 were, for that reason, subject to liability for wrongful death.

¶ 39 In addition, the State contends that, when the False Claims Act is read

 consistently with the federal False Claims Act as required by N.C.G.S. § 1-616(c),

 local governments and, by extension charter schools, are subject to liability under the

 Act. See Cook Cnty v. United States ex rel. Chandler, 538 U.S. 119, 122 (2003)

 (holding that municipal corporations qualify as “persons” for purposes of 31 U.S.C. §

 3729, the federal False Claims Act). In addition, the State cites United States ex rel.

 Oberg v. Ky. Higher Educ. Student Loan Corp., 681 F.3d 575, 579–80 (4th Cir. 2012),

 in which the Fourth Circuit held that the determination of whether an entity is

 considered a “person” under the federal False Claims Act hinges upon the extent to

 which the entity in question is “truly subject to sufficient state control to render [that

 entity] a part of the state,” with the federal courts being required to utilize Eleventh

 Amendment “arm-of-the-state” analysis in order to make that determination.
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

¶ 40 The State contends that, in this case, there is no need for the use of “arm-of-

 the-state” analysis given that the use of such a method is not necessary to “determine

 the scope of sovereign immunity in state court,” with this issue being, “instead[,]

 controlled by state law.” In the alternative, however, the State contends that, even if

 “arm-of-the-state” analysis should be used in instances like this one, the Academy

 would still be a “person” capable of being sued under the False Claims Act given that

 the State is not liable for civil judgments entered against charter schools, charter

 schools operate with significant autonomy from the State, the operation of a charter

 school implicates purely local concerns, and the relevant statutory provisions

 establish that charter schools are not agencies or instrumentalities of state

 government.

¶ 41 In seeking to have us affirm the Court of Appeals’ determination that charter

 schools are not “persons” subject to liability pursuant to the False Claims Act, the

 Academy begins by suggesting that, as a state agency, it is protected by the doctrine

 of sovereign immunity. In addition, the Academy asserts that a charter school is not

 a “person” for purposes of the False Claims Act in light of the failure of the False

 Claims Act to define “person” and the fact that the False Claims Act gives no

 indication that it was intended to authorize the filing of actions against state

 agencies, public schools, or charter schools. In the same vein, the Academy contends

 that treating charter schools as “persons” for purposes of the False Claims Act would
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 conflict with the Act’s “spirit, intent, or purpose” given that the availability of qui tam

 actions, in which between fifteen and twenty-five percent of the resulting recovery

 would be paid to a private citizen who initiated such an action, would have the effect

 of “taking funds designated for educational purposes and giving them to a private

 citizen.” According to the Academy, the Court of Appeals correctly utilized “arm-of-

 the-state” analysis in determining that charter schools were not subject to liability

 under the False Claims Act given that the False Claims Act is supposed to be

 construed consistently with the equivalent federal statutory provisions.

¶ 42 We begin our analysis of this issue by noting that the rules for statutory

 construction delineated in N.C.G.S. § 12-3 “shall be observed” “[i]n the construction

 of all statutes” “unless such construction would be inconsistent with the manifest

 intent of the General Assembly or repugnant to the context of the same statute.” In

 view of the fact that a non-profit corporation of the type that is statutorily required

 to operate a charter school is clearly a “corporate” body, a charter school is necessarily

 encompassed within the statutory definition of “person” set out in N.C.G.S. § 12-3(6).

 As a result, as was the case in Jackson, the literal language of N.C.G.S. § 12-3(6)

 indicates that a charter school is a “person” subject to liability for purposes of the

 False Claims Act unless that result would be “inconsistent with the manifest intent

 of the General Assembly” or “repugnant to the context of the same statute.”
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

¶ 43 We see no reason why utilizing a definition of “person” consistent with that set

 out in N.C.G.S. § 12-3(6) would be inconsistent with the General Assembly’s intent in

 enacting the False Claims Act or repugnant to the remaining provisions contained in

 that legislation. The obvious purpose of the False Claims Act is to ensure that public

 funds are spent in the manner for which they were intended instead of being

 misappropriated, misspent, or misused. In view of the fact that a nonprofit

 corporation is perfectly capable of using public funds in a manner that is inconsistent

 with the prohibitions set out in N.C.G.S. § 1-607(a), the use of a definition of “person”

 that sweeps in such entities would not be in any way inconsistent with the purposes

 that the General Assembly sought to achieve by enacting the False Claims Act. Thus,

 the use of a definition of a “person” that includes a charter school for purposes of the

 False Claims Act seems perfectly consistent with the legislative intent as expressed

 in N.C.G.S. § 12-3(6).

¶ 44 In addition, none of the arguments that have been advanced by the Academy

 in opposition to the use of the definition of a “person” set out in N.C.G.S. § 12-3(b)

 have merit. As we have already demonstrated, a charter school is not entitled to

 invoke the doctrine of sovereign immunity as a defense to an action brought pursuant

 to the False Claims Act. In the same vein, given that “arm-of-the-state” analysis is

 used for purposes of the federal False Claims Act to ensure compliance with the

 protections available to state governments under the Eleventh Amendment and since
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 the same purpose is served by determining whether the entity against whom the

 action is sought to be brought is protected by the doctrine of sovereign immunity as

 a matter of state law, the use of “arm-of-the state” analysis for purposes of

 determining whether a particular entity is a “person” for False Claims Act purposes

 would be an exercise in redundancy. Similarly, the fact that the False Claims Act

 does not contain a definition of a “person” is entitled to little weight in our analysis

 given that such a definition, which is applicable to all statutory provisions, appears

 in N.C.G.S. § 12-3(6). Finally, the qui tam provisions of the False Claims Act do not

 render the use of a definition of a “person” consistent with N.C.G.S. § 12-6(3)

 inappropriate on the theory that these provisions would divert some amount of what

 would otherwise be public money to private citizens, given that the use of qui tam

 actions is an essential portion of the mechanism that has been created for the purpose

 of ensuring compliance with the strictures of the False Claims Act and that the same

 argument would justify absolving any and all public entities from False Claims Act

 liability, a result that would risk significant misuse of public funds. As a result, for

 all of these reasons, we hold that the Court of Appeals erred by holding that the

 Academy was not a “person” for purposes of the False Claims Act.

 3. Pleading Requirements under the False Claims Act

¶ 45 In its conditional petition for discretionary review, the Academy sought and

 obtained authorization to address an additional issue that the Court of Appeals did
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 not reach relating to the sufficiency of the State’s complaint in stating a claim under

 the False Claims Act. According to the Academy, the State’s complaint did not satisfy

 the requirements for pleading a False Claims Act claim given the State’s failure to

 plead its claim with sufficient particularity or to plead the existence of an objective

 falsehood.

¶ 46 According to the Academy, the average daily membership estimate of 366

 students that it reported for the 2013–14 school year was nothing more than a

 “projection” that the Academy was statutorily authorized to make rather than an

 objective falsehood. In support of this assertion, the Academy directs our attention

 to the decision by the United States Court of Appeals for the Fifth Circuit that “[a]

 prediction, or statement about the future, is essentially an expression of opinion” that

 cannot be deemed to be objectively false. Presidio Enters., Inc. v. Warner Bros.

 Distrib. Corp., 784 F.2d 674, 680 (5th Cir. 1986). According to the Academy, “the

 alleged statement was legally authorized by statute and cannot be a false statement”

 given that the number of students specified in the allegedly false estimate “was

 within the twenty percent increase authorized” by N.C.G.S. § 115C-218.7. In the

 Academy’s view, an estimate of increased enrollment that is within twenty percent of

 an existing estimate simply cannot be “unreasonable and reckless” or false and that

 the estimate was within the statutory scope of the discretion that the charter school

 was statutorily authorized to exercise.
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

¶ 47 Finally, the Academy argues that the fact that defendants made efforts to

 increase student enrollment at the Academy and to keep the school viable suffices to

 “defeat” the State’s “allegations that the claim made for 366 students was knowingly

 false at the time it was made” in light of the board’s hope that the school would remain

 open. More specifically, the Academy claims that it “engage[d] in an advertising

 campaign, repair[ed] the HVAC, [bought] buses, and [sought] refinancing” in an

 attempt to remain open. In addition, the Academy argues that the State was fully

 aware of the Academy’s financial situation at the time that the allegedly false

 estimate was made and contends that, “[i]f the government knows and approves of

 the particulars of a claim for payment before that claim is presented, the presenter

 cannot be said to have knowingly presented a fraudulent or false claim.” United

 States ex rel. Laird v. Lockheed Martin Eng’g & Sci. Servs. Co., 491 F.3d 254, 263 (5th

 Cir. 2007).

¶ 48 In response to the Academy’s contentions, the State asserts that it satisfied the

 requirements for pleading a fraud-based claim set out in N.C.G.S. § 1A-1, Rule 9(b),

 by alleging the “time, place and contents” of the allegedly fraudulent claim. According

 to the State, it satisfied the applicable pleading requirements by stating that, in a

 phone call that Mr. Hall made to the Department on 26 April 2013, he falsely

 “increased the school’s projected enrollment for the next year to 366 students”; by

 naming the “person making the representation” as Mr. Hall; and by describing “what
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 was obtained as a result of the fraudulent acts or representations” as the “$344,340.44

 in excess funds” that the State paid to the Academy as a result of the overstatement

 in the Academy’s estimated enrollment. As a result, the State contends that its

 complaint adequately alleged a claim against the Academy pursuant to the False

 Claims Act.

¶ 49 According to the False Claims Act, any “person” who “[k]nowingly presents or

 causes to be presented a false or fraudulent claim for payment or approval” or who

 “[k]nowingly makes, uses, or causes to be made or used, a false record or statement

 material to a false or fraudulent claim” shall be “liable to the State for three times

 the amount of damages that the State sustains because of the act of that person.”

 N.C.G.S. §§ 1-607(a)(1), (2). N.C.G.S. § 1A-1, Rule 9(b) provides that, “[i]n all

 averments of fraud, duress or mistake, the circumstances constituting fraud or

 mistake shall be stated with particularity.” In order to satisfy the particularity

 requirement delineated in N.C.G.S. § 1A-1, Rule 9(b), the plaintiff must allege the

 specific “time, place and content of the fraudulent representation, the identity of the

 person making the representation and what was obtained as a result of the

 fraudulent acts or representations.” Terry v. Terry, 302 N.C. 77, 85 (1981).

¶ 50 In its complaint, the State alleged that, during a conversation with a

 Department official that occurred on 26 April 2013, Mr. Hall had “increased the

 school’s projected enrollment for the next year to 366 students,” with this number
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 representing “an increase of 56 students from the 310 estimated enrollment that [the

 Academy] submitted with a draft budget three months earlier” and that the making

 of this statement resulted in a violation of the False Claims Act because it constituted

 a. making a claim for state educational funds based on
 a projected enrollment of 366 students — a number that
 defendants knew or should have known they would not
 achieve;

 b. making a claim for state educational funds for the
 2013–14 school year when defendants knew or should have
 known that [the Academy] would not survive the year;

 c. making a false claim for state funds to be used for a
 non-profit educational purpose that were instead used to
 benefit defendants.

 As a result, the State clearly satisfied the requirements of N.C.G.S. § 1A-1, Rule 9(b),

 by alleging that Mr. Hall stated in a phone call that occurred on 26 April 2013 that

 there would be 366 students enrolled at the Academy for the 2013–14 school year,

 that $344,340.44 in excess funds had been allotted to the Academy as a result of this

 allegedly false representation, and that the State was seeking to recoup this amount

 from defendants, a group that included the Academy. As a result, we hold that the

 State satisfied the requirements of N.C.G.S. § 1A-1, Rule 9(b), in pleading its False

 Claims Act claim against the Academy.

¶ 51 In addition, we reject the Academy’s contention that the State failed to plead

 the making of an “objective falsehood” and that the State was on notice that the

 enrollment estimate upon which its False Claims Act claim relied might be lacking
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 in substantive support. Although the Academy vigorously argues that a projected

 enrollment figure cannot be the sort of objective falsehood necessary to support

 liability under the False Claims Act and that the State should have known the nature

 and extent of the Academy’s financial situation at the time that the Academy

 submitted the enrollment estimate upon which the State’s False Claims Act relies,

 we do not find either of these arguments to be persuasive.

¶ 52 As we read the applicable statutory provision, the estimate of a charter school’s

 student enrollment, which determines how much money the charter school is entitled

 to receive from the State, must be a genuine, good-faith estimate of the number of

 students that the charter school anticipates serving rather than an arbitrary figure

 that the charter school is entitled to present to the Department regardless of its

 accuracy. A contrary interpretation of the relevant statutory language would

 authorize charter schools to requisition ever-greater amounts of money from the State

 regardless of their actual need for the amount of money in question. On the basis of

 similar logic, the Fourth Circuit has held that an estimate that that is devoid of any

 factual support is actionable under the federal False Claims Act. Harrison v.

 Westinghouse Savannah River Co., 176 F.3d 776, 792 (4th Cir. 1999) (cleaned up)

 (stating that an “estimate carries with it an implied assertion, not only that the

 speaker knows no facts which would preclude such an opinion, but that he does know

 facts which justify it”).
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

¶ 53 Similarly, while the State certainly knew that the Academy had long-standing

 financial difficulties and that the Academy’s enrollment numbers had been declining,

 the State’s complaint does not establish that the State had full knowledge of the

 Academy’s situation at the time that Mr. Hall submitted an allegedly inflated student

 enrollment estimate to the Department. In fact, the complaint alleges that the

 Academy never informed the Department of the two short-term loans that the

 Academy took out in the late spring and early summer of 2013. Assuming, without

 in any way deciding, that knowledge of the falsity of the relevant representation

 might be sufficient to prevent a finding of liability for the making of that statement

 under the False Claims Act, any such argument would lack sufficient support given

 the record that is before us in this case.

¶ 54 The potential harm worked by the Academy’s interpretation of the relevant

 statutory provisions is demonstrated by the allegations in the State’s complaint, in

 which the Academy allegedly estimated that it would serve a far greater student

 population than it had any basis for believing would actually materialize, received

 more funds than it could actually use for the purpose of educating students in the

 upcoming academic year, and used the funds to make questionable payments that

 had the effect of benefitting school officials and their relatives. Had the Academy

 refrained from making such an unsupported estimate of student enrollment, the

 funds that it obtained and used to pay expenses associated with operations during
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 earlier periods of time would have been available for the education of North Carolina

 students rather than used for purposes that benefitted the Academy and school

 officials. As a result, for all of these reasons, we hold that the trial court did not err

 by denying the Academy’s motion to dismiss the State’s complaint for failure to state

 a claim under the False Claims Act.

 C. Liability of Mr. Hall

¶ 55 In seeking to persuade us to reverse the Court of Appeals’ determination that

 the record failed to contain sufficient information to establish that he was entitled to

 invoke the protections of public official immunity, Mr. Hall begins by asserting that

 he is a public official because his position as “CEO/Principal” of the Academy was

 “created by delegation from the Constitution and Statutes as a matter of law,”

 including Article IX, Section 2 of the North Carolina Constitution, which establishes

 a “general uniform system of free public schools,” and N.C.G.S. § 115C-218.15, which

 provides that a “charter school that is approved by the State shall be a public school

 within the local school administrative unit in which it is located.” In addition, Mr.

 Hall asserts that, as the Academy’s “CEO/Principal,” he had discretionary authority

 and exercised “a part of the sovereign power of the State.” Finally, Mr. Hall contends

 that, since he is entitled to public official immunity, he is not a “person” subject to

 liability under the False Claims Act.
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

¶ 56 In response, the State contends that, in determining whether a person is

 entitled to public official immunity, reviewing courts must consider a number of

 factors, including “(1) whether the position was created by the constitution or

 statutes, and (2) whether the official exercises a portion of the sovereign power.” See

 Isenhour v. Hutto, 350 N.C. 601, 610 (1999). In view of the fact that the duties of the

 Chief Executive Officer or principal of a charter school are not outlined in any

 statutory or constitutional provision, the State asserts that Mr. Hall is not a public

 officer entitled to the protection of public official immunity. Finally, the State asserts

 that, even if Mr. Hall was otherwise entitled to claim the benefits of the public official

 immunity doctrine, the knowing making of false statements is not the sort of activity

 for which an award of immunity would be appropriate.

¶ 57 As the Court of Appeals correctly recognized, “a public official, engaged in the

 performance of governmental duties involving the exercise of judgment and

 discretion, may not be held personally liable for mere negligence in respect thereto,”

 Isenhour v. Hutto, 350 N.C. 601, 609–10 (1999), with such public official immunity

 having been recognized because “it would be difficult to find those who would accept

 public office or engage in the administration of public affairs if they were to be held

 personally liable for acts or omissions involved in the exercise of discretion and sound

 judgment,” Miller v. Jones, 224 N.C. 783, 787 (1945). However, public official

 immunity is not available to public employees, as compared to public officials, id. at
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

787, or relating to the actions of a public official that were “corrupt or malicious” or

“outside of or beyond the scope of his duties,” Smith v. Hefner, 235 N.C. 1, 7 (1952)

(citations omitted). Assuming, without in any way deciding, that a “CEO/Principal”

is a public official rather than a public employee and that such a person exercises

discretionary authority, we agree with the Court of Appeals that, in light of the

State’s allegation that Mr. Hall knowingly made “false or fraudulent statements in

connection with receiving state funds,” the State’s complaint contained sufficient

allegations to preclude dismissal of the False Claims Act claim that it asserted

against Mr. Hall. As a result, the Court of Appeals did not err by denying Mr. Hall’s

motion to dismiss the False Claims Act claim that the State sought to assert against

him in his individual capacity.5

 5 In addition to his assertion that he was entitled to the dismissal of the False Claims

Act claim that the State had asserted against him on public official immunity grounds and
his contention that, like the Academy, he could not be held liable based upon his estimate of
the Academy’s likely student enrollment based upon the State’s failure to adequately plead
its False Claims Act claim with sufficient particularity, which we reject for the reasons stated
earlier in this opinion, Mr. Hall argues that the Attorney General lacked the authority to file
suit against him on the State’s behalf, that the State’s claim was barred by the applicable
statute of limitations, that the Attorney General’s actions violated the separation of powers
provision of the North Carolina Constitution, and that the State had failed to adequately
allege a waiver of sovereign immunity. However, none of these additional arguments have
any merit given that the Attorney General is specifically authorized to bring False Claims
Act claims on behalf of the State by N.C.G.S. § 1-608(a), the State’s complaint was filed within
six years of the making of the allegedly false statements as authorized by N.C.G.S. § 1-615(a),
the Attorney General was acting in accordance with specific legislative authorization at the
time that he filed suit against Mr. Hall, and the State had no obligation to plead waiver of an
immunity to which Mr. Hall was not entitled. As a result, we hold that none of the additional
arguments that Mr. Hall has advanced have merit.
 STATE V. KINSTON CHARTER ACAD.

 2021-NCSC-163

 Opinion of the Court

 III. Conclusion

¶ 58 Thus, for the reasons set forth above, we hold that the Court of Appeals erred

 by concluding that charter schools were entitled to assert a defense of sovereign

 immunity and were not “persons” for purposes of the False Claims Act. In addition,

 we hold that the State adequately stated a claim for relief against the Academy and

 Mr. Hall under the False Claims Act. Finally, we hold that the Court of Appeals

 correctly held that Mr. Hall was not, at least on the basis of the present record,

 entitled to obtain the dismissal of the State’s complaint on the basis of public official

 immunity and that Mr. Hall’s other challenges to the trial court’s order lack merit.

 As a result, the Court of Appeals’ decision is affirmed, in part, and reversed, in part,

 and this case is remanded to the Court of Appeals for further remand to Superior

 Court, Wake County, for further proceedings not inconsistent with this opinion.

 AFFIRMED, IN PART; REVERSED, IN PART; AND REMANDED.

 Justice BERGER did not participate in the consideration or decision of this

 case.